# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 28, 2014

Lyle W. Cayce
Clerk

No. 13-20562

AMY R. GORMAN,

Plaintiff - Appellant

v.

VERIZON WIRELESS TEXAS, L.L.C.; VERIZON WIRELESS SERVICES, L.L.C.; GTE MOBILNET OF SOUTH TEXAS, LIMITED PARTNERSHIP,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, GARZA, and HIGGINSON, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Amy Gorman contends she was discharged by Verizon in retaliation for complaining of discrimination and harassment, in violation of the Texas Commission on Human Rights Act. She filed this suit in Texas state court. Verizon removed it to federal court on the basis of diversity. Thus Texas law must apply in this appeal; which leads us to the question of whether the exhaustion of administrative remedies under Texas law is jurisdictional or merely a condition precedent that may be forgiven. We hold that the exhaustion requirement here—the requirement to receive a right to sue letter before filing suit—is only a condition precedent. Thus, when we consider the appeal on its merits, we find no merit, based on the absence of causation

No. 13-20562

between Gorman's complaints and her discharge; the decisionmaker had no knowledge of the alleged protected activity claimed by Gorman. Although the Verizon executive terminating her had no knowledge of her complaint, she did have knowledge of a complex commission-generating scheme in which Gorman was implicated and from which she profited.

I.

Amy Gorman worked in government sales for the related corporate entities Verizon Wireless Texas, L.L.C., Verizon Wireless Services, L.L.C., and GTE Mobilnet of South Texas, L.P. (collectively, "Verizon"). Gorman supervised a team of six. Her immediate superior was Darryl Williams, who also worked in government sales. Still further above her was her supervisor Jason Smith, who oversaw business sales.

Gorman alleged that Smith discriminated against her on the basis of her sex. In the district court's words, she alleged that, "Smith consistently treated her worse than her male colleagues. For example, she alleges that he excluded her from meetings, social events, networking functions, and dinners; excluded her from important business emails and other communications; and, in general, treated her in a more derogatory fashion, including cursing and name-calling." *Gorman v. Verizon Wireless Texas, LLC*, No. 4:11-CV-729, 2013 WL 4520187, at *1 (S.D. Tex. Aug. 24, 2013) (internal quotation marks and citations omitted).

In September 2009, Smith advised Gorman she should consider taking a different, perhaps less prestigious position that did not involve managing a team. This advice was prompted because Gorman and her team had failed to meet sales quotas throughout 2009. Gorman initially agreed that she would move to this position. Before changing positions, however, Gorman met with the Verizon human resources department. There, she complained about Smith's allegedly discriminatory conduct. This complaint is the protected

2

activity that she engaged in, and which she claims resulted in her eventual termination.

Gorman's meeting with human resources led her to decide not to take the new job after all and to remain in her current job. Several months later, in December or January 2010, Gorman voluntarily accepted a third position at Verizon, which could have resulted in a salary cut, depending on her performance.

Verizon acted on Gorman's complaints about Smith. Deeone McKeithan of Verizon's human resources department met with Smith to investigate Gorman's allegations. McKeithan did not mention Gorman as the source of the complaint. McKeithan asked questions about several of the two hundred employees Smith had under him, and one of the employees discussed was Gorman. McKeithan concluded there was no basis to believe Smith had discriminated against or harassed anyone.

Around the time of the complaint, in October 2009, Gorman became enmeshed in a manipulative scheme by Verizon employees to enlarge their commissions at Verizon's expense. This misdeed came to light in March 2010, when the Texas Department of Criminal Justice ("TDCJ"), the state agency customer who benefited indirectly from the employee scheme, contacted Verizon about an invoice it believed it had mistakenly received. This complaint set off an investigation that revealed a scheme dating back to October 2009. It implicated Gorman, Gorman's supervisor Williams, Gorman's subordinate Robert Whittleman, and another Verizon employee Chris Medlenka ("TDCJ Team"). Through this team, Verizon committed to give the TDCJ 200 phones for free as well as a $20,000 credit. At the same time, Verizon was to activate 200 lines but then immediately suspend them for six months, ensuring TDCJ, the customer, would be charged nothing. This arrangement would be cancelled after six months. The Verizon employees involved would receive commissions,

because after six months any contract cancellations would not undo commissions previously awarded to employees. TDCJ was an innocent party in the scheme, as far as the record shows.

Verizon lost $75,000 as a result of the scheme. It began to investigate the scheme's details in April 2010. Victor Fettes, who worked in Verizon's finance department, assigned Sandra Cocetti, another Verizon employee, to investigate the TDCJ transaction. During the investigation, one of the TDCJ team confessed that the scheme's purpose was to gain commissions. He also stated that Gorman was fully aware of the transaction's details. Although Gorman questioned the deal and raised concerns about the transaction to her immediate superior, Williams, she did nothing more. Williams was part of the TDCJ team and apparently in on the scheme as well. Gorman was on vacation when the scheme was initiated. She did, however, gain $1,200 in commissions from the transaction.

Cocetti's findings were reported to Fettes (finance department), Smith (Gorman's superior), and McKeithan (human resources department). These three relayed the findings to Kay Henze, Verizon's regional president. Henze decided to fire the entire TDCJ team. Her first reason was that the TDCJ team violated the honesty policy of Verizon's code of conduct in structuring the transaction. Her second reason was that even if those fired did not know the full details of the transaction, they should have known given the large size of the deal. Fettes, Smith and McKeithan concurred in the termination decision. Gorman was fired on July 7, 2010. The other TDCJ team members were also fired.

Gorman filed suit in Texas state court on November 19, 2010, alleging claims of gender discrimination and retaliation under the Texas Commission on Human Rights Act ("TCHRA"). Tex. Labor Code Ann. § 21.001 et seq. (West 2013). Before filing suit, Gorman had also filed charges of discrimination with

the federal Equal Employment Opportunity Commission ("EEOC") and had received a right to sue from that agency. At the time of filing suit, she had also filed a charge of discrimination with the Texas Workforce Commission ("TWC") but had not yet received her right to sue from that agency. After filing, she received a right to sue letter from the TWC.

Verizon removed the case to the United States District Court for the Southern District of Texas and eventually moved for dismissal or, in the alternative, summary judgment. The district court declined to dismiss the claims based on Gorman's failure to receive a TWC right to sue letter before filing her suit, holding that her eventual receipt of the letter had cured her initial failure. *Gorman*, 2013 WL 4520187 at *3, n.1. The court then granted summary judgment in favor of the defendants on Gorman's gender discrimination and retaliation claims. It held that Gorman failed to make her prima facie case on either claim. *Id.* at *3–6. Alternatively, on the retaliation claim, Gorman had also failed to rebut Verizon's non-pretextual reason for firing her. *Id.* at *6. Gorman now appeals the judgment regarding her retaliation claim only.

## II.

We first address Verizon's argument that we should dismiss Gorman's case on jurisdictional grounds. The district court declined to do so. We review jurisdictional questions de novo. *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000).

So, turning to the statute at issue. The TCHRA is modeled on Title VII. Like Title VII, the TCHRA provides that certain administrative steps are required before pursuing judicial remedies. *Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 488 (Tex. 1991). Among these is filing a complaint with the TWC. Afterwards, a judicial complaint may be filed only after the TWC either dismisses the administrative complaint or the TWC fails to resolve the

complaint within 180 days. *Jones v. Grinnell Corp.*, 235 F.3d 972, 975 (5th Cir. 2001). It is undisputed that Gorman did not meet either of these requirements before filing suit.[1] The district court, however, excused this failure as subsequently cured by Gorman's receipt of a TWC right to sue letter after the suit commenced. *Gorman*, 2013 WL 4520187 at *3, n.1. The court reasoned that curing the initial defect was possible because the TCHRA right to sue requirement was not jurisdictional. *See id.*

At issue on appeal is whether, under Texas law, failure to receive a right to sue letter is a jurisdictional defect, which cannot be excused, or a condition precedent, which may. The Texas Supreme Court held in *Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 488 (Tex. 1991), that failure to file an administrative complaint and pursue administrative remedies was a jurisdictional prerequisite. At the time of *Schroeder*, a TCHRA provision also mandated that a civil action must be filed within one year from the filing of the administrative complaint. *Schroeder* held that this requirement, too, was jurisdictional. *Id.* at 487, n.10.

The Fifth Circuit subsequently relied on *Schroeder* in holding that, under the TCHRA, exhaustion of state remedies was a jurisdictional requirement. *Jones*, 235 F.3d at 974. *Jones* held that the court could not excuse a plaintiff's failure to obtain a right to sue letter from the TWC, as this requirement was jurisdictional. *Id.*

Since our opinion in *Jones*, however, the Texas Supreme Court has overturned *Schroeder*, explicitly and implicitly. *In re: USAA*, 307 S.W.3d 299, 311 (Tex. 2010), expressly overturned *Schroeder*'s holding that the TCHRA statute of limitations was jurisdictional. First, *USAA* reasoned that the Texas

---

[1] Gorman had received an EEOC right to sue letter before filing her lawsuit, but this cannot be substituted for a TWC right to sue letter. *See Jones*, 235 F.3d at 974.

No. 13-20562

Supreme Court had been "reluctant to conclude that a provision is jurisdictional, absent clear legislative intent to that effect" since a landmark 2000 Texas case that post-dated *Schroeder*. *Id.* at 306 (discussing *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71 (Tex. 2000)) (internal quotation marks omitted). Second, *USAA* noted that "[t]he United States Supreme Court [had] consistently construed Title VII's requirements as mandatory and not jurisdictional." *Id.* at 308. This was significant, the court said, because Title VII and its interpretations serve as a guide to interpreting the TCHRA. *See id.* at 308–09.

Although not explicit, *USAA* also overturned *Schroeder*'s holding that the TCHRA right to sue letter requirement is jurisdictional. Two reasons lead us to this conclusion. First, the TCHRA's exhaustion of remedies requirement is not expressly required by the statute but is inferred by the courts from the statute's structure. *See Schroeder*, 813 S.W.2d at 487. Consequently, the "clear legislative intent" that *USAA* held was necessary to render a provision jurisdictional is lacking. *USAA*, 307 S.W.3d at 306. If the TCHRA's exhaustion of remedies requirement is not jurisdictional, neither is the right to sue requirement, which is part of the exhaustion requirement.

Second, *USAA* emphasized the importance of harmonizing the interpretations of the TCHRA and Title VII. *Id.* at 308–09. Prior to *USAA*, Texas law deviated from federal law. Under federal law, "the receipt of a right-to-sue letter is a condition precedent" that can be cured by subsequent receipt of the letter. *Pinkard v. Pullman-Standard*, 678 F.2d 1211, 1215 (5th Cir. 1982). It is anomalous that receiving a right to sue letter is a jurisdictional requirement for the TCHRA but is not jurisdictional under Title VII. *Compare Schroeder*, 813 S.W.2d at 488, *with Pinkard*, 678 F.2d at 1215. Reading *USAA* to eliminate this anomaly is the only way to satisfy *USAA*'s concern that the TCHRA and Title VII should be harmonized.

No. 13-20562

We hold that in the light of *USAA*, the failure to receive a Texas right to sue letter is not a jurisdictional defect. Our previous case, *Jones*, relied on *Schroeder*, which *USAA* has since abrogated. Consequently, *Jones*'s holding that the Texas right to sue requirement is jurisdictional has no basis in Texas law, upon which *Jones* relied; *Jones* lost its precedential value when *USAA* became the rule under Texas law. *See Farnham v. Bristow Helicopters, Inc.*, 776 F.2d 535, 537 (5th Cir. 1985) ("A panel of this court cannot 'overturn' the decision of another panel. In diversity cases, however, we are to follow subsequent state court decisions that are clearly contrary to a previous decision of this court").

Because the right to sue requirement is not jurisdictional, and because Gorman belatedly fulfilled the requirement, we can reach the merits of her case.[2]

## III.

We next review Gorman's claim that she made out a prima facie case for a retaliation claim. We hold that she has not.

The district court granted summary judgment in favor of the defendants, which we review de novo. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012). If there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is proper. FED. R. CIV. P. 56(a). A genuine dispute of material fact means that "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Evidence is viewed in the light most favorable to the nonmovant. *Royal v. CCC&R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir. 2013).

---

[2] Verizon supplies no reason why, in this particular case, we should not excuse the initial absence of a TWC right to sue letter.

The substantive law governing Title VII and TCHRA retaliation claims is identical. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999). Making a prima facie case for a retaliation claim requires the plaintiff to "demonstrate that: (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. Under [the TCHRA], an employee has engaged in protected activity if she has opposed any practice made an unlawful employment practice under [the TCHRA]." *Royal*, 736 F.3d at 400 (internal quotation marks omitted).

If the plaintiff establishes her prima facie case, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). Under *McDonnell Douglas*, "(1) the employee must demonstrate a prima facie case of retaliation; (2) the burden then shifts to the employer, who must state a legitimate non-retaliatory reason for the employment action; and (3) if that burden is satisfied, the burden then ultimately falls to the employee to establish that the employer's stated reason is actually a pretext for unlawful retaliation." *Royal*, 736 F.3d at 400.

Gorman fails to establish prong three, causation, in her prima facie case for two reasons. First, Gorman was fired ten months after her complaint, significantly discrediting the link between her complaint and firing. "[T]o be persuasive evidence, temporal proximity must be very close." *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007). Close temporal proximity is lacking here. Gorman supplies no reason why Verizon would wait ten months before terminating her based on her complaint.

Gorman asserts that adverse employment action occurred before her termination, which would decrease the time between her complaint and Verizon's supposed reprisals. But there is no support in the record for characterizing the incidents Gorman recites as adverse employment actions.

For example, Gorman cites her change of jobs in December 2009 as an adverse employment action.  But Gorman stated that she voluntarily accepted this position.  Regarding Smith specifically, we agree with the district court that "there is nothing in the record to support" that "Smith's treatment of her became worse after her accusation [against him]." *Gorman*, 2013 WL 4520187 at *5.

The second reason that Gorman's prima facie case fails is that Henze, the Verizon executive who fired her, did not know of her complaint about Smith.  Generally, "[i]f the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said . . . that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 n.6 (5th Cir. 2003).  However, a coworker who is aware of the plaintiff's protected activity may under certain circumstances supply the causation requirement.  This may be so even when the coworker is not himself the decisionmaker. *See Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1191–94 (2011).  One example is when a coworker makes a recommendation to terminate and the decisionmaker is merely a rubber stamp on that coworker's decision. *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).  Another example is when the coworker "had influence or leverage over the official decisionmaker." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000).

To address this issue in our case, we begin by noting that Henze did not have knowledge of Gorman's complaint.  Additionally, Smith denied knowing of Gorman's complaint.  But viewing the evidence in the light most favorable to Gorman, Smith reasonably could have gleaned knowledge of the complaint when he was interviewed by McKeithan, as Gorman came up in the interview. We thus will assume that Smith knew of Gorman's complaint.

We should, however, make note that there is no genuine dispute but that Henze was the decisionmaker.  Furthermore, there is no record support that Smith, McKeithan or Cocetti were joint decisionmakers along with Henze. Fettes, Smith, and McKeithan met with Henze and explained the TDCJ transaction.  Henze then told them that anyone involved with the transaction should be fired.  During discovery, Henze specifically stated that, "I made the decision to terminate Gorman [and the TDCJ team].  Fettes, Smith, and McKeithan agreed with my decision."  On Henze's instructions, Smith then filled out a form to discharge Gorman.  Thus, the record supports that Henze, and only Henze, was in control at all times of the decision to discharge Gorman.

Because the decisionmaker, Henze, was unaware of Gorman's complaint, Gorman can establish her prima facie case only if Smith's animus was the cause behind her termination and Henze was a mere "rubber stamp."  *See Sherrod*, 132 F.3d at 1122.  There is simply no evidence to support such a conclusion.  Smith was part of a team of two other people that presented the TDCJ deal to Henze and agreed with Henze's decision to discharge those involved, including Gorman, only after Henze had made the decision.  This diluted whatever influence Smith may have had over Henze.  Additionally, Henze's decision was based on an independent investigation into the deal.  An independent investigation fairly conducted usually prohibits the ultimate decisionmaker from being a "rubber stamp" because it acts as a superseding cause to the termination decision.  *See Sherrod*, 132 F.3d at 1122–23.  Gorman points out minor deficiencies in the investigation, such as the investigator's ignorance of who precisely set up the terms of the TDCJ deal.  But these deficiencies are tangential to the core of the investigation and affect nothing regarding Henze's insulation from any influence of Smith.

Because Gorman fails to demonstrate a genuine dispute of material fact as to causation between her complaint and her termination, her prima facie

case fails.  This is sufficient for us to conclude that summary judgment in favor of the defendants is proper.  Consequently, we do not reach the *McDonnell Douglas* burden shifting framework.

IV.

For the reasons above, the district court's judgment is AFFIRMED.