**REVISED March 30, 2017**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 10, 2017

Lyle W. Cayce
Clerk

No. 15-40428

WILLIAM FISHER,

      Plaintiff-Appellant Cross-Appellee

v.

LUFKIN INDUSTRIES, INCORPORATED,

      Defendant-Appellee Cross-Appellant

Appeals from the United States District Court
for the Eastern District of Texas

Before DENNIS, ELROD, and GRAVES, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

William Fisher brought this action against his former employer, Lufkin Industries, Inc., alleging, inter alia, that Lufkin violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., by discharging him in retaliation for his complaint that his direct supervisor racially harassed him.[1]  Following

---

[1] Fisher also asserted claims for racial discrimination in violation of Title VII, as well as retaliation and discrimination claims under 42 U.S.C. § 1981.  On appeal, however, Fisher does not challenge the district court's judgment against him with respect to his § 1981 claim or his Title VII racial discrimination claim.

a two-day evidentiary hearing, the presiding magistrate judge, acting as a special master pursuant to 42 U.S.C. § 2000e-5(f)(5) and Federal Rule of Civil Procedure 53, issued a Report and Recommendation recommending that the District Court find facts as follows: although the initial complaint by Fisher that his supervisor racially harassed him by addressing him as "boy" was meritless, Lufkin's subsequent investigation and ultimate discharge of Fisher were motivated by the desire of a coworker and a supervisor to retaliate against him for his protected activity; however, Fisher lied to his supervisors during the investigation and did not fully cooperate in it, and these latter actions by Fisher were sufficient to justify his termination independent of any other proffered reasons.

Fisher filed objections and moved for an extension of time to file additional objections to the report, but the district court rejected his motion, adopted the Report and Recommendation in full without assigning additional reasons, and therefore dismissed Fisher's retaliation claim. Fisher appeals the district court's decision and its refusal to grant an extension of time to file additional objections to the Report and Recommendation. Lufkin filed a cross-appeal seeking to assess its expert witness's fee against Fisher. We reverse the district court's judgment against Fisher and remand for further proceedings.

I

Fisher, an African American man, was first employed by Lufkin in 1991. Fisher experienced three layoffs due to reductions in force but was rehired each time and eventually accumulated ten years of seniority before his termination on May 18, 2009, which is the subject of this lawsuit. He began his employment as a helper but was promoted to machinist in January of 2005. Fisher performed his job in a satisfactory manner, received regular merit raises, and

had never been disciplined prior to his termination.  At the time that he was terminated, Fisher was fifty-five years old.

Steve Saxton, Fisher's direct supervisor, is a white man who was approximately thirty-one years old at the time Fisher was terminated.  On Friday, March 6, 2009, Saxton instructed Fisher to take his breaks when everyone else did, rather than when Fisher wanted to.  When Fisher replied that he could not take breaks when his machine was running during certain operations, Saxton responded, "Boy, I don't know why every time I come over here it's a hassle!"  Saxton was angry and spoke with a raised voice.  Fisher then stated, "If you're going to harass me, we need to get a steward."  Due to union rules, Saxton told Fisher to come to his office while a union steward was summoned.  When no steward appeared, Saxton told Fisher to return on Monday so that they could resume the process.  After he left, Fisher called Lufkin's Vice President of Human Resources, Paul Perez, and left a voicemail stating that Saxton's use of "boy" in addressing him constituted racial harassment.  Perez promptly directed another manager, Ty Thornton, to conduct an investigation.  Thornton talked to both Fisher and Saxton and determined that, although Saxton had called Fisher "boy," he did not intend it as a racially derogatory term.  Saxton's supervisor, David Jinkins, was also asked to look into the matter and talk to Saxton.  The magistrate judge found that Saxton probably intended "boy" as an exclamation rather than as an epithet for Fisher.

In April 2009, about a month after that incident, David Rhoden, a white coworker of Fisher's, went to Jinkins and complained that he did not like the fact that Fisher had reported Saxton for using the word "boy" and that he was offended by Fisher's statements that he would get Saxton fired.  Jinkins testified that during this conversation Rhoden mentioned that Fisher had long

been selling DVDs out of his lunch box and that some of them were pornographic. Rhoden, however, testified that it was Jinkins who raised the question of whether Fisher sold DVDs out of his lunch box. Jinkins called Thornton to hear what Rhoden had to say. Jinkins thereupon came up with a plan for Rhoden to conduct a "sort of sting operation" by buying DVDs from Fisher. Rhoden testified that he had never bought a DVD from Fisher and did not want to buy one even after Jinkins asked him to do so, but he nevertheless agreed to comply after Jinkins told him, "You scratch my back and I'll scratch yours." Rhoden soon bought a DVD from Fisher and took it to Jinkins, but it turned out to be blank. Jinkins instructed Rhoden to try again. The second time, Jinkins was able to view the DVD and said that he thought it was pornographic.

On May 11, 2009, Jinkins and Thornton called in the chief union steward, Kerroy Thomas. Saxton brought Fisher to a conference room where Thornton, Jinkins, Saxton, and Thomas spoke with Fisher about conducting an unauthorized business on company property that involved pornographic material. Fisher said he did not have any such materials with him that day but did not admit or deny that he was engaged in such activity. He asked why this was coming up now and said that he did not know that "trading" things violated company policy.

The group then asked Fisher to go with them to open his locker. In the locker, they found a manila envelope that contained five DVDs.[2] Fisher said they were not his and that they must have been planted because the hinges of

---

[2] Among the DVDs found in the manila envelope, one was titled "Interracial Cherry Poppers XXX." Even though he denied owning the DVDs, Fisher took them with him when he left work that day and said that he destroyed the titled DVD described above because it was blank.

4

his locker were broken and anyone could have forced their way in, and he denied selling any videos.[3]

When asked to allow a search of his car in the parking lot, Fisher initially cooperated but then claimed that he had to leave to tend to his wife, who was ill, and therefore did not allow a search of the passenger compartment. Fisher claimed that while at his locker, he had received a phone call from his wife. Thomas testified that he heard Fisher's phone ring but the other witnesses testified that they did not hear anything.

After Fisher left work during the attempt to search his car, he was suspended by Thornton pending further investigation. The day after the search, Thornton prepared notes regarding the search, which he and Jinkins eventually presented to Perez. On May 18, 2009, Fisher was terminated via a letter signed by Jinkins, written at Perez's direction, which stated only that he was fired "for a serious violation of company policy." No further details were given to Fisher about his termination at that time.

## II

Based on the evidence taken during the two-day evidentiary hearing, the magistrate judge found that Fisher sold DVDs at Lufkin and that he lied to his supervisors about that fact during the course of their investigation. However, the magistrate judge also found that Rhoden's and Jinkins's actions were motivated by their desire to retaliate against Fisher for his racial discrimination or harassment complaint against Saxton. The magistrate judge explained, first, that there was persuasive evidence that many employees

---

[3] At the evidentiary hearing, Fisher admitted to selling and trading videos but denied selling any pornographic videos. After Lufkin's handwriting analyst testified that the titles of two DVDs produced by Lufkin from undisclosed sources, "XX White Hot Nurses XX" and "Nina Hartley–Stroking to the Oldies," were written by the same hand who wrote Fisher's employment applications in his personnel file, Fisher's counsel stated that he did not contest the analyst's conclusions.

possessed pornographic magazines at work without any complaint, warning or discipline by Lufkin, and that employees had sold all manner of goods at work without complaint or discipline by Lufkin. Second, the magistrate judge reasoned that the lengths to which Jinkins went to pursue the investigation of Fisher, recruiting Rhoden to buy videos from Fisher not once but twice, showed "an unusual interest in the matter." Third, the magistrate judge noted that Lufkin had no clear work rule against Fisher's conduct other than one that would require a mere warning for a first offense.[4] In this context, the magistrate judge also noted that Lufkin's witnesses were unsure about the nature of Fisher's violation and changed their position a number of times.[5]

Thus, the magistrate judge concluded that Jinkins and Rhoden undertook their actions against Fisher not simply as a disciplinary matter but as retaliation against Fisher for his protected activity in complaining about his alleged racial harassment by Saxton. Nevertheless, the magistrate judge found that Fisher's termination was justified independent of any other reasons

---

[4] Although the magistrate judge did not cite, quote, or describe the rule he referenced, the record indicates that he was referring to Plant Rule 14, which states:

> Employees will not engage in any activity other than assigned work on company premises. And in this connection, the unauthorized solicitation of funds, selling or soliciting the sale of articles, circulating petitions, balloting, distributing, or reading handbills or other literature will not be permitted unless same has been authorized in advance by personnel department.

At his deposition, Jinkins testified that although Rule 14 technically prohibited the distribution and sale of articles without company authorization, an employee was supposed to receive a written warning for his first infraction; a written warning and layoff for remainder of his shift for the second infraction; a 3-day disciplinary suspension for the third infraction; and a 5-day suspension for the fourth infraction. Only after the fifth infraction is the employee supposed to be terminated.

[5] The magistrate judge found that John Havard, Lufkin's Compliance Manager, was unable to persuasively point to a company policy covering or prohibiting Fisher's conduct in selling DVDs at work. Havard pointed to Lufkin's sexual harassment policy and asserted that the sale of DVDs created an offensive and intimidating work environment. However, the magistrate judge found that "no one had complained and there was no evidence that anyone likely to be offended had ever seen the conduct" and noted that Havard was unable to define when possession of pornography would violate the rule.

because he "resisted the investigation by leaving before his car could be properly searched and by lying to his supervisors about his activities."

## III

Fisher's primary contention on appeal is that the district court erred in accepting the magistrate judge's conclusion that Lufkin did not violate Title VII's anti-retaliation provisions when it terminated him. Specifically, Fisher argues that because the investigation into his DVD sales was launched in response to his complaint about Saxton addressing him as "boy," he has satisfied the causation element of his retaliation claim and his resistance to the investigation cannot be used to justify his termination. Lufkin responds that "there was no evidence of a retaliatory animus on the part of Ty Thornton, who conducted the investigation into Fisher's sale of pornography, or Paul Perez, who ordered the investigation and made the decision to terminate Fisher." It argues that there was sufficient evidence to support the district court's conclusion that Fisher would have been terminated even in the absence of any retaliatory action against him. We conclude that Fisher has shown a sufficient causal connection between his protected activity and his termination to warrant reversal.

## A

A Title VII retaliation plaintiff must establish that (1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action. *Zamora v. City of Hous.*, 798 F.3d 326, 331 (5th Cir. 2015) (citing *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 394 (5th Cir. 2000)). The parties agree that the first two requirements are satisfied in this case, and thus only the third is in dispute. To establish the requisite causal connection between the protected

activity and the adverse employment action, a plaintiff must show "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

In *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), the Supreme Court held that, under the "cat's paw" theory, an employer can be held liable for a discrimination claim under the Uniformed Services Employment and Reemployment Rights Act even if the ultimate decisionmaker herself holds no discriminatory animus as long as the plaintiff can demonstrate that her decision was influenced by another who does hold such animus. Applying general principles of tort law, the Court explained, "Animus and responsibility for the adverse action can both be attributed to the earlier agent . . . if the adverse action is the intended consequence of that agent's discriminatory conduct." *Id.* at 419. The Court clarified that "the exercise of judgment by the decisionmaker does not prevent the earlier agent's action . . . from being the proximate cause of the harm," as it does not "automatically render[ ] the link to the supervisor's bias 'remote' or 'purely contingent.'" *Id.* at 419. The Court further explained that the ultimate decisionmaker's judgment cannot automatically be deemed a "superseding cause" that breaks the causal chain of the harm. *Id.* at 420. Rather, the decisonmaker's judgment should only be considered a superseding cause if it is "a cause of independent origin that was not foreseeable." *Id.* at 420 (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)).

In recent years, our court has had a few opportunities to apply *Staub*. In *Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165, 171 (5th Cir. 2014), a case involving an allegation of retaliatory discharge in violation of the Texas Commission on Human Rights Act, we recognized that the "earlier agent" who

harbors retaliatory animus may be a coworker, rather than a supervisor.[6] And in *Zamora*, we joined a majority of our sister circuits in holding that a Title VII retaliation plaintiff is entitled to use the cat's paw theory of liability if he can demonstrate that a person with a retaliatory motive "used the decisionmaker to bring about the intended retaliatory action." 798 F.3d at 331. We explained that such a plaintiff must produce sufficient evidence that "(1) his . . . supervisors, motivated by retaliatory animus, took acts intended to cause an adverse employment action; and (2) those acts were a but-for cause of his [termination]."[7] *Id.* at 333. Discussing the second prong, we noted that "an investigation that 'result[ed] in an adverse action for reasons unrelated to the . . . [supervisors']' retaliatory statements" could be a superseding cause, breaking the causal chain. *Id.* at 334 (alterations in original) (quoting *Staub*, 562 U.S. at 421). However, we emphasized that "if an independent investigation 'takes [a supervisor's biased report] into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified,' the supervisor's action 'may remain a causal factor.'" *Id.* at 334-35 (alterations in original) (quoting *Staub*, 562 U.S. at 421).

## B

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Coe v. Chesapeake Exploration, L.L.C.*, 695 F.3d 311, 316 (5th Cir. 2012). "A finding

---

[6] Although *Gorman* involved the interpretation of the Texas Commission on Human Rights Act, we noted, "The substantive law governing Title VII and TCHRA retaliation claims is identical." 753 F.3d at 170 (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999)).

[7] We read the *Zamora* court's use of the word "supervisor" to conform to the facts of that case, which involved retaliatory action taken by several of the plaintiff's supervisors, rather than to conflict with the *Gorman* court's recognition that a non-supervisory coworker may be the earlier agent who sets off the causal chain.

is clearly erroneous when the appellate court, viewing the evidence in its entirety, is left with the definite and firm conviction that a mistake has been made." *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 356 (5th Cir. 2016) (quoting *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258-59 (5th Cir. 2006)). "The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to [clear error] review." *Exxon*, 517 U.S. at 840-41.

It is clear from the Report and Recommendation that Fisher satisfied both prongs of *Zamora*'s cat's paw analysis. The magistrate judge expressly found that "a desire to retaliate against Fisher" motivated Rhoden to complain about Fisher and motivated Jinkins to launch the investigation of Fisher. The magistrate judge also found that the "subsequent discipline was motivated by a desire to retaliate for Fisher's protected activity." The magistrate judge's findings therefore also lead to the necessary conclusion that the investigation would not have taken place but for Rhoden's and Jinkins's retaliatory actions. However, the magistrate judge concluded that Fisher's lack of cooperation with the investigation was "sufficient to justify his termination independent of any other proferred [sic] reasons." We read this statement by the magistrate judge as concluding that Fisher's resistance somehow broke the causal chain. To review this conclusion, we turn to the traditional tort-law principles of proximate cause and superseding cause and conclude that the district court clearly erred in accepting the magistrate judge's proposed finding. *Staub*, 562 U.S. at 417.

"Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" *Id.* at 419 (alteration in original) (quoting *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010)). Here,

Fisher's lack of cooperation with an investigation that was launched for retaliatory purposes was inextricably tied to his coworker's and supervisor's retaliatory animus. It would be implausible, in light of this record, to conclude that Rhoden's retaliatorily motivated initial complaint and Jinkins's subsequent efforts to initiate and pursue a retaliatory investigation were so "remote" as to not be the cause of the ensuing discipline of Fisher. Rhoden's and Jinkins's retaliatory actions therefore served as a proximate cause of Fisher's termination. *See Staub*, 562 U.S. at 419.

Nor can it be said that Fisher's refusal to acquiesce fully in the retaliatory investigation and search of his personal effects served as a superseding cause. "A cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable.'" *Id.* at 420 (quoting *Exxon*, 517 U.S. at 837). While we do not endorse Fisher's response, we view his mild resistance to a retaliatory investigation as entirely foreseeable.[8] The magistrate judge's conclusion that Fisher's lack of cooperation with Lufkin's retaliatorily motivated investigation, based on a dubious work rule violation, severed the causal chain between Fisher's protected activity, for which Rhoden and Jinkins retaliated against him, and his ultimate termination by Lufkin is thus implausible in light of the record read as a whole, and the district court clearly erred in accepting it. *See Deperrodil*, 842 F.3d at 356.

Because Fisher has demonstrated that "(1) his . . . supervisors, motivated by retaliatory animus, took acts intended to cause an adverse employment action; and (2) those acts were a but-for cause of his [termination]," he is entitled to relief. *See Zamora*, 798 F.3d at 333.

---

[8] Indeed, to shield employers from liability for adverse actions taken in response to such resistance would be to incentivize supervisors motivated by retaliatory animus to initiate groundless investigations with the purpose of causing the targeted employees to resist them, thereby leading to the employer's adverse actions. We decline to provide such an incentive.

IV

We REVERSE the district court's judgment and REMAND for further proceedings and rendition of judgment consistent with this opinion. In light of this disposition, the remainder of the issues raised in Fisher's appeal and Lufkin's cross-appeal are DISMISSED as moot.