# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 13, 2018

No. 17-10737

Lyle W. Cayce
Clerk

AUTOBAHN IMPORTS, L.P.,
  Doing Business as Land Rover of Fort Worth,

Plaintiff–Appellee,

versus

JAGUAR LAND ROVER NORTH AMERICA, L.L.C.,

Defendant–Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

This is a dispute between a U.S. car distributor, Jaguar Land Rover North America ("Jaguar"), and a franchised dealership, Autobahn Imports ("Autobahn"), concerning chargebacks of around $300,000 in incentive payments the distributor had made to the dealer. The Board of the Texas Department of Motor Vehicles (the "Board") declared the chargebacks invalid, and

No. 17-10737

Jaguar exercised its statutory right of review in the state appellate court. While that appeal was pending, Autobahn sued for damages based on the Board's findings, claiming violations of the Texas Deceptive Trade Practices Act ("DTPA") and breach of contract. Before the state court of appeals had completed its review, the federal district court granted summary judgment to Autobahn on its various claims. Because Autobahn's antecedent failure to exhaust divested the district court of power to decide the claim when it did, summary judgment is vacated and remanded.

I.

Jaguar offers an incentive known as the "Business Builder Program," which provides dealers a percentage of the retail price of every vehicle sold if certain conditions are met. The relevant terms are set out in the Business Builder Program Manual ("Manual") and the Operations Bulletin ("Rules"), collectively referred to as the Business Builder Contracts.[1] According to Jaguar, dealerships are entitled to incentive payments if they (1) deliver each new vehicle to the "end-user"; (2) submit the end-user's name and address to Jaguar; and (3) maintain the necessary documentation to support that address. The Rules define an "end user" as "a purchaser/lessee purchasing or leasing a vehicle from an authorized Dealership for retail, commercial or business use, with no intent to resell. An approved leasing company purchasing to lease is considered an end user." The Rules offer no definition of an "approved leasing company."

In 2010, a dispute arose regarding the procedures and policies governing the 2011 Business Builder Program, and Autobahn filed a complaint with the

---

[1] *See also Autobahn Imports, L.P. v. Jaguar Land Rover N. Am., L.L.C.*, No. 17-10349, 2018 WL 1612252, at \*1 (5th Cir. Apr. 3, 2018) (per curiam) (unpublished).

No. 17-10737

Texas Department of Motor Vehicles. Before the Board acted, Jaguar and Autobahn entered into the 2011 Settlement Agreement, which outlined certain "Handover Policies" that Autobahn would follow. That agreement required Autobahn to extend to "[e]very retail purchaser . . . an invitation to visit Autobahn's dealership personally" to receive the vehicle, or to conduct the handover "at the residence/office of the purchaser or end-user." The agreement stated that "[a]ll deliveries . . . will be conducted by trained Autobahn personnel."

The parties dispute the reach of the agreement. Jaguar asserts that the Handover Policies apply to all "end users," while Autobahn insists that it applies only to "individual retail purchasers, not leasing companies."

A new dispute regarding the 2013 Business Builder Program forms the principal basis for the current action. Jaguar conducted an audit of Autobahn's sales from February 2013 through January 2014. The auditor looked at 134 sales files, "all of which involved sales to leasing companies," and claimed that in 90 cases, Autobahn was not entitled to an incentive payment because "[d]elivery was not made to the vehicle's end-user by an authorized Land Rover retailer representative." Instead, the leasing agency delivered the vehicle to the lessee. The auditor initiated 91 chargebacks for incentive payments.[2] Autobahn appealed, and Jaguar affirmed all but 5, resulting in $317,204.80 in chargebacks.

In May 2014, Autobahn filed a complaint with the Board, alleging that the chargeback violated Section 2301.467(a)(1) of the Texas Occupations Code, which prohibits a manufacturer, distributor, or representative from

---

[2] "A manufacturer or distributor may make charge-backs to a dealer if, after an audit, the manufacturer or distributor has reasonable grounds to conclude that the dealer committed fraud with respect to the incentive program." TEX. OCC. CODE § 2301.475(b).

## No. 17-10737

"requir[ing] adherence to unreasonable sales or service standards."[3] Autobahn sought "a declaration from the Board that [Jaguar's] interpretation of 'end-user' to exclude a leasing company purchasing a vehicle from Autobahn" violated that prohibition.

The Board referred Autobahn's complaint to an administrative law judge ("ALJ") at the State Office of Administrative Hearings. In August 2015, the ALJ issued a Proposal for Decision, concluding that the chargebacks violated Section 2301.467(a)(1). The ALJ noted that the dispute ultimately turned on the question "whether a leasing company is an end-user under the terms of the Business Builder documents." The ALJ thought yes. While noting that neither the Manual nor the Rules define "an approved leasing company," she still found that "[s]ales to leasing companies are qualified sales under Business Builder according to the Program documents." She concluded that Jaguar's "chargebacks to Autobahn for sales to leasing companies . . . [were] invalid under . . . § 2301.467(a)(1) for requiring adherence to unreasonable sales or service standards."[4]

The Board adopted the ALJ's findings of fact and conclusions of law and issued a final order stating that Jaguar "improperly charged back against [Autobahn] certain incentive payments for sales to leasing companies and that those chargebacks are invalid and rescinded."

In November 2016, Jaguar appealed the Board's order to the state court

---

[3] TEX. OCC. CODE § 2301.467(a)(1). Autobahn also alleged that the action violated Section 2301.468, which prohibits a manufacturer or distributor from "treat[ing] franchised dealers of the same line-make differently," *see id.* at § 2301.468, but the parties agree that Autobahn has since conceded that claim.

[4] The ALJ also concluded that Jaguar's chargebacks violated § 2301.468 "for treating Autobahn unfairly or inequitably in its sale of [Jaguar's] vehicles," but Autobahn has since abandoned that claim.

of appeals.[5]   During the pendency of that appeal, Autobahn sued in state court,[6] claiming breach of contract and violations of the DTPA, the latter of which would entitle it to treble damages.[7]

Jaguar removed, and Autobahn sought summary judgment.  It claimed (1) Jaguar's "violation[] of Section 2301, as found by the Board, establish[es] Autobahn's claim under the [DTPA] as a matter of law" and (2) that "the Board expressly found that the underlying agreements . . . collectively constitute valid and enforceable contracts that [Jaguar] breached by virtue of wrongful charge-backs."  Jaguar replied that (a) the action was premature because Autobahn had not yet exhausted its administrative remedies and that (b) even if the action were properly before the court, Autobahn was not entitled to treble damages on summary judgment because it had not established that Jaguar acted "knowingly" as required by the DTPA.

The federal district court rejected Jaguar's exhaustion argument, reasoning that "the Board's final order is final and enforceable."  The court then granted summary judgment on Autobahn's DTPA and breach-of-contract

---

[5] The Texas Court of Appeals's review of Board decisions is fairly deferential.  The court will "reverse or remand a case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (A) in violation of a constitutional or statutory provision; (B) in excess of the agency's statutory authority; (C) made through unlawful procedure; (D) affected by other error of law; (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."  *Jaguar Land Rover N. Am. v. Bd. of the Tex. Dep't of Motor Vehicles*, No. 3-16-00770-cv, 2017 WL 6756997, at *5 (Tex. App.—Austin Dec. 21, 2017, no pet.) (internal quotations omitted).

[6] Separate suit was necessary because the Texas Occupations Code does not grant the Board authority to award damages for the relevant claims.

[7] While these proceedings were underway, Jaguar credited the $317,204.80 charge-back to Autobahn's customer account, "subject to a full reservation of rights, without waiver of its claims or defenses . . . , and subject to the right to insist upon the return of [the] sum in the event Jaguar ultimately prevails in its appeal or otherwise obtains relief."

No. 17-10737

claims but denied "double recovery" as to the latter.  Jaguar appealed, and, in the interim, the Texas Court of Appeals affirmed the Board's order.[8]

## II.

## A.

The parties dispute the point at which the Board's order became final for purposes of administrative exhaustion.  We agree with Jaguar that Autobahn filed too soon.

Sitting in diversity, we apply Texas substantive law on the exhaustion question,[9] "look[ing] first [and foremost] to the final decisions of the Texas Supreme Court."[10]  Where that court has yet to speak directly to the question, "we must make our best Erie guess,"[11] with the recognition that "non-binding language from the [Texas] [S]upreme [C]ourt is the second- or third-best predictive indicium of how [it] might decide."[12]

Our analysis begins and ends with *Subaru of America v. David McDavid Nissan*, 84 S.W.3d 212, 221 (Tex. 2002), which offers the court's most thorough explication of exhaustion and the Board's jurisdiction.  A car dealership had sued a manufacturer for several Code violations without first having sought administrative relief.  The court began its analysis by explaining that Texas

---

[8] *Jaguar*, 2017 WL 6756997, at *9 ("We cannot conclude that there is no reasonable basis in the record for the determination that the chargebacks violated section 2301.467(a)(1) or that the determination was arbitrary, capricious or affected by legal error.").

[9] *Gorman v. Verizon Wireless Tex., L.L.C.,* 753 F.3d 165, 166 (5th Cir. 2014) ("Texas law must apply in this appeal; which leads us to the question of whether the exhaustion of administrative remedies under Texas law is jurisdictional or merely a condition precedent that may be forgiven.").

[10] *Austin v. Kroger Tex. LP*, 746 F.3d 191, 196 (5th Cir. 2014).

[11] *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 628 (5th Cir. 2000).

[12] *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 774–75 (5th Cir. 2018).

agencies enjoy two forms of jurisdiction: "primary" and "exclusive." *Id.* at 220. The former is "prudential," the latter "jurisdictional." *Id.* Hence, where the agency possesses exclusive jurisdiction, "a party must first exhaust administrative remedies before a trial court has subject matter jurisdiction over a dispute." *Id.* at 222. As for Code-based claims, the Texas Motor Vehicle Commission Code "creates a hybrid claims-resolution process" whereby "the Board has *exclusive jurisdiction* . . . over claims and issues the Code governs, [and] a party must exhaust administrative remedies to obtain a Board decision about Code violations, if any, to support a DTPA or bad-faith claim based on Code violations." *Id.* at 224 (emphasis added).

After identifying exhaustion as jurisdictional, the court opined on *when* it first occurs:

> The Board's decision becomes "final" (and thus a party has exhausted administrative remedies) for purposes of a party's pursuing damages in a trial court for Code-based claims: (1) after the time to seek substantial-evidence review of the Board decision expires, if no affected person seeks such review . . . ; or (2) after an affected person who seeks judicial review exhausts the substantial-evidence review avenues . . . .

*Id.* It is undisputed that Autobahn filed for damages, and the district court granted summary judgment in its favor, before completion of substantial-evidence review. *Subaru* thus suggests the district court lacked subject-matter jurisdiction to enter summary judgment.

The federal district court dismissed the above-cited language as "nothing more than dicta" unsupported by the very statutory authorities upon which the *Subaru* court purportedly had relied. The court concluded that the Board order was clearly a "final board order"—noting that the order itself was titled "Final Order"—and pointed to statutory provisions stating that an appeal of a final

board order should not affect its enforcement.[13]   The district court thus con-cluded Autobahn need not wait for the Texas Court of Appeals.

We cannot agree.  It is "error" for a "federal district court [to] dismiss[] [the Texas Supreme Court's] language as [mere] dictum."  *DePuy*, 888 F.3d at 774.  Though the district court's position finds some support in the relevant statutes, its decision pays insufficient homage to the body charged with final interpretive authority over the statutes at issue.

As an initial matter, the *dictum* from *Subaru* likely isn't "mere *dicta*," but rather binding "judicial *dictum*."  Texas courts recognize two types of *dicta*: *obiter dictum*, which "is a statement not necessary to the determination of the case and that is neither binding nor precedential," and *judicial dictum*, which "is a statement made deliberately after careful consideration and for future guidance in the conduct of litigation."  *Lund v. Giauque*, 416 S.W.3d 122, 129 (Tex. App.—Fort Worth 2013, no pet.).[14]  The latter "should be followed unless found to be erroneous."  *Id.*

*Subaru*'s language bears all the hallmarks of judicial *dictum*.  Its intro-ductory sections carefully trace the nature of the Board's jurisdiction, the con-tours of exhaustion for Code-based claims, and their combined effect on a "[t]rial court's adjudicat[ive]" role in the hybrid-claims process.  *Subaru*, 84 S.W.3d at 223–24.  The court was careful to delineate exactly how a party exhausts its claims in the hybrid-claims process, emphasizing that "the Board's decision becomes 'final' (*and thus a party has exhausted administrative reme-dies*) for purposes of a party's *pursuing damages in a trial court . . .* after *. . .* substantial-evidence review" is completed.  *Id.* at 224 (emphasis added).  And

---

[13] *See* TEX. GOV. CODE §§ 2001.176, 2001.144(a)(2)(A); TEX. OCC. CODE § 2301.755.

[14] *See also Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 399 (Tex. 2016); *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 773 (Tex. 1964).

the court ratified its view of finality, stating that "any further reference to final board findings means 'final' *as we define this term here*." *Id.* at 224 n.2 (emphasis added). Language as to when exhaustion occurs was plainly intended to guide future courts *and litigants* on the appropriate time to file for damages based on Code violations. And though the Texas high court is certainly free to revisit that binding *dictum*, we lack the authority to do so.[15]

Autobahn resists on two accounts. First, the language from *Subaru* "was not necessary to the resolution of the case," and second, it is "impossible" that the statement was made "deliberately after careful consideration," because there was no briefing on the issue.

Both rebuttals fail badly. The first zeros in on the wrong distinction: Even if necessity to the outcome might separate some holdings from *dicta*,[16] it certainly cannot discriminate among gradations of the latter. And as for the second reply, it assumes too much of counsel and far too little of our state-court colleagues. *Subaru* itself proves as much.

In the alternative, Autobahn avers more forcefully that the language from *Subaru* "lacks even 'persuasive' force because it is erroneous." This assertion requires that we train our attention carefully on the two relevant statutory provisions with which *Subaru* purportedly conflicts: Texas Occupations Code

---

[15] *Cf. Terminiello v. City of Chi.*, 337 U.S. 1, 5 (1949) (explaining, in the First Amendment context, that "the gloss which [a state court] placed on the ordinance gives it a meaning and application which are conclusive on" federal courts); *accord Gooding v. Wilson*, 405 U.S. 518, 520 (1972) ("Only the [state] courts can supply the requisite construction, since of course 'we lack jurisdiction authoritatively to construe state legislation.'" (quoting *United States v. Thirty-seven (37) Photographs*, 402 U.S. 363, 369 (1971))).

[16] We state this only provisionally because the language of a decision may carry binding weight even when unnecessary to the particular result. *Cf. Saucier v. Katz*, 533 U.S. 194, 207 (2001) (explaining that courts can decide whether an underlying constitutional violation took place even if qualified immunity bars the suit and renders the antecedent constitutional judgment unnecessary to the result), *rev'd on other grounds in Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

No. 17-10737

§ 2301.755 and Texas Government Code § 2001.176(b)(3).  The first reads as follows:

> An appeal under this subchapter *does not affect the enforcement of a final board order* unless:
>
> > (1) the enforcement of the order is enjoinable under Chapter 65, Civil Practice and Remedies Code, and under principles of primary jurisdiction; or
> >
> > (2) the board, in the interest of justice, suspends the enforcement of the order pending final determination of the appeal.

TEX. OCC. CODE. § 2301.755 (emphasis added).  Similarly, Texas Government Code § 2001.176 states that "[u]nless otherwise provided by statute," the filing of a petition for review "*does not affect the enforcement of an agency decision*"— such as the Board decision at issue here—for which substantial-evidence review is authorized.  TEX. GOV. CODE § 2001.176(b)(3) (emphasis added).

Autobahn contends that Section 2301.755 "plainly means that if one party appeals an adverse final board order, and if neither of the two exceptions applies, then the other party may file, prosecute, and obtain judgment in an action to enforce the final board order."  Autobahn claims that Section 2001.176(b)(3) points in the same direction and that both provisions apply to anyone—court or administrative agency—with the authority to enforce a Board order.

Jaguar's counter is plain enough.  It reads the statutes' references to "enforcement" to cover only the Board's *own* enforcement of its orders and not the initiation of a damages action in a trial court.  As proof, Jaguar cites Section 2301.805(b), which clarifies that the trial court in a damages action is not technically enforcing the Board's order but instead "giv[ing] deference to the [Board's] findings of fact and conclusions of law" "in the interest of judicial economy and efficiency."  TEX. OCC. CODE § 2301.805(b).

10

These dueling interpretations turn on a recurring source of uncertainty in statutory interpretation: To whom is the statute addressed? *Subaru* tacitly embraces Jaguar's narrowing construction, and Autobahn offers nothing on appeal to show that that interpretive choice was an unreasonable one. In the absence of error, that judicial *dictum* should control.

But even if *Subaru*'s language were not binding, the district court should have granted it heavy weight in wagering its *Erie* guess. *See DePuy*, 888 F.3d at 774. *Subaru*'s language is at least arguably consistent with the statutory scheme, and it provides the clearest signal of the position of Texas's highest civil court. Given that far "weak[er]" *dictum* is generally "relevant to the [*Erie*] inquiry," *id.* at 775, *Subaru*'s unmistakable clarity ought to have controlled.

In short, Autobahn failed to exhaust before the federal district court entered judgment in its favor. Because that failure was jurisdictional, the district court lacked the power to decide the case when it did. *See Subaru*, 84 S.W.3d at 218.

## B.

Autobahn asserts, by way of a supplemental letter, that even if it failed to exhaust before entry of summary judgment, the issue is "moot" because the state court of appeals has since rejected Jaguar's challenge to the Board's determinations. But Autobahn offers no support for that conclusional proposition. And when pressed at oral argument to explain how we could affirm a jurisdictionally defective judgment, Autobahn's only answer was to resist the premise, insisting that it had successfully exhausted with the Board's determination. But having just crossed that bridge, we see no permissible way to reach Autobahn's preferred result.

Nothing in the post-judgment developments changes things. In *Grupo*

No. 17-10737

*Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004), the Court explained, albeit in the context of diversity jurisdiction, that "the jurisdiction of the court depends upon the state of things at the time of the action brought." (internal quotation omitted).[17]   Here, the jurisdictional defect not only was present at the time of filing but persisted through summary judgment.[18]  Given that the court lacked the authority to decide the case when it did, we cannot now "hypothesize [its] subject-matter jurisdiction for the purpose" of passing upon, and potentially affirming, its merits determination.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999).

The Texas Supreme Court has described just one potentially relevant escape hatch from the failure to exhaust in this context:  "[I]f the impediment to jurisdiction could be removed, then the court may abate proceedings to allow a reasonable opportunity for the jurisdictional problem to be cured."[19]   But nothing in Texas law suggests this "opportunity" persists after judgment; the caselaw and common sense prove the opposite.[20]  And though some courts have

---

[17] This court and others have cited *Grupo Dataflux* in the context of exhaustion without second-guessing its applicability.  *See, e.g., Nat'l Football League Players Ass'n v. Nat'l Football League*, 874 F.3d 222, 225 (5th Cir. 2017); *accord Doctors Nursing & Rehab. Ctr. v. Sebelius*, 613 F.3d 672, 677 (7th Cir. 2010) (noting that although the time-of-filing rule "is primarily encountered when determining the prerequisites of diversity jurisdiction," it "is not so limited").

[18] Although the possibility for abatement would seem to cut against a strict time-of-filing rule, *see Subaru*, 84 S.W.3d at 228, we need not square that circle, as the court lacked jurisdiction not merely at the time of filing but also when it entered summary judgment.

[19] *Am. Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 805 (Tex. 2001); *see also Subaru*, 84 S.W.3d at 228.

[20] For federal-exhaustion examples, see *National Football League*, 874 F.3d at 227 n.5 (holding the failure to exhaust in arbitration before a court filing could not be "cured by the subsequent issuance of an arbitral award"); *accord Macon v. Youngstown Sheet & Tube Co.*, 698 F.2d 858, 861 & n.2 (7th Cir. 1983) (same); *Galvan v. SBC Pension Benefit Plan*, 204 F. App'x 335, 339 (5th Cir. 2006) (rejecting the argument that a plaintiff's "administrative remedies were exhausted *after* she filed her original complaint"); *accord Whitley v. Dr. Pepper Snapple Grp., Inc.*, 4:17-CV-0047, 2017 WL 4155257, at *4 (E.D. Tex. Sept. 19, 2017) (citing *Galvan* to reject the argument that the "[d]efendants' exhaustion argument [was] moot since

No. 17-10737

appeared to excuse post-filing jurisdictional defects when cured before judgment,[21] here the defect remained through the early stages of this appeal. Autobahn cites no authority to suggest a jurisdictional defect like this can be "mooted" through exhaustion after the fact.[22]

Accordingly, the summary judgment is VACATED and REMANDED.[23]

---

administrative remedies [were] exhausted" after filing but before the court ruled). For a Texas-exhaustion example, see *Gorman*, 753 F.3d at 169 (where a plaintiff filed suit, and only afterward received her right-to-sue letter from the Texas Commission on Human Rights, we deemed the defect cured, but emphasized the issue turned on whether the requirement of a right-to-sue-letter was a "*jurisdictional defect, which cannot be excused*, or a condition precedent, which may" (emphasis added)).

[21] *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 75 (1976); *see also Positive Black Talk Inc. v. Cash Money Records, Inc.,* 394 F.3d 357, 367 (5th Cir. 2004) (excusing failure to register a copyright—which the court believed was a "jurisdictional prerequisite" to an infringement suit—where the requirement was "satisf[ied] . . . *before final judgment*" (emphasis added)), *abrogated on other grounds by Reed Elsevier, Inc. v. Munchnick*, 559 U.S. 154, 160 n.2 (2010); *H & D Tire & Auto.-Hardware, Inc. v. Pitney Bowes Inc.,* 227 F.3d 326, 328 (5th Cir. 2000) ("Even if a court lacks jurisdiction at the time of removal and regardless of whether there was an objection to the removal, the judgment will stand if the court had jurisdiction at the time it entered judgment."); *Ellison Steel, Inc. v. Greystar Constr. LP*, 199 F. App'x 324, 327 (5th Cir. 2006) ("[I]n some cases this Court will not disturb a judgment even though a jurisdictional defect existed at some point prior to entry of judgment if jurisdiction existed at the time judgment was entered."). *But see Bowles v. Russell,* 551 U.S. 205, 214 (2007) ("Court[s] ha[ve] no authority to create equitable exceptions to jurisdictional requirements . . . .").

[22] An exception concerns a federal court's ability to cure imperfect diversity by dismissing a "dispensable nondiverse party . . . *even after judgment has been rendered.*" *Grupo Dataflux*, 541 U.S. at 573 (emphasis added) (citing *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 832 (1989)); *id.* (explaining that even "courts of appeals . . . have the authority to cure a jurisdictional defect by dismissing a dispensable nondiverse party" even after judgment has been entered). But in reversing this circuit, the Court made clear this was the exception, not the rule. *See id.* at 574 (cautioning against "manufactur[ing] brand-new exception[s]" to the time-of-filing rule).

[23] Under ordinary circumstances, our analysis would end here, without comment on the merits of the summary judgment decision. But in light of the Texas court's post-judgment ratification of the Board's findings and the possibility that the district court *may* retain jurisdiction on remand, we write briefly to note that summary judgment on the DTPA claim was likely unwarranted.

Autobahn is entitled to treble damages if Jaguar's conduct was "committed knowingly," TEX. BUS. & COMM. CODE § 17.50(b)(1), that is, with "actual awareness, at the

No. 17-10737

We place no limitation on the matters that the district court can address on remand.

_____

time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the [dealer's] claim," *id.* § 17.45(9). Actual awareness requires that "a person must think to himself at some point, 'Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.'" *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53–54 (Tex. 1998). That is a high bar indeed, and the summary judgment record appears insufficient to surmount it.

The mere fact that the Board adopted Autobahn's interpretation of the contract terms does not show that Jaguar acted knowingly. At a minimum, there appears to be a genuine dispute of material fact as to whether Jaguar acted based on a good-faith interpretation of the relevant contract provision when it initiated the chargebacks and when it continued to withhold the funds during the appeal, particularly because the contract does not define the term "approved leasing company." "[A] party's state of mind is inherently a question of fact which turns on credibility," and "[c]redibility determinations . . . are within the province of the fact-finder." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991). Though "[t]his is not to say that the court can never enter summary judgment when intent or state of mind is at issue . . . , the court must be vigilant to draw *every* reasonable inference from the record in a light most flattering to the nonmoving party." *Id.* at 1266. That posture suggests summary judgment on the DTPA claim was premature.