# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-20292

United States Court of Appeals
Fifth Circuit

**FILED**

May 4, 2015

Lyle W. Cayce
Clerk

PETER J. PASKE, JR.,

      Plaintiff - Appellant

v.

JOEL FITZGERALD, Individually and in his Capacity as Chief of Police of the City of Missouri, Texas; THE CITY OF MISSOURI CITY, TEXAS,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, JONES, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Plaintiff-appellant Peter J. Paske ("Paske") appeals the district court's grant of summary judgment to defendants-appellees Joel Fitzgerald ("Fitzgerald") and the City of Missouri City, Texas (the "City") (collectively, the "Government"). For the reasons explained below, we AFFIRM the judgment of the district court.

## FACTS AND PROCEEDINGS

Paske served as a sergeant in the Missouri City Police Department (the "Department"). Paske is white. In 2009 the City hired Fitzgerald to serve as chief of police. Fitzgerald is black. After Fitzgerald's arrival, two captain

positions became available. Paske interviewed for the positions, but Fitzgerald chose two other candidates. As relevant here, Fitzgerald hired Geneane Merritt ("Merritt") to fill one of the positions. Merritt is black. Paske and Merritt had various run-ins over the next two years. *See Paske v. Fitzgerald*, No. H-12-2915, 2014 WL 1366552, at *1 (S.D. Tex. Apr. 7, 2014). This growing tension came to a head over events that occurred in July 2011.

On July 11, 2011, Merritt sent an e-mail to Fitzgerald requesting funeral leave so that she could attend her grandmother's funeral in Philadelphia. She told Fitzgerald that "the Funeral [was] going to be on Friday, July 15, 2011," and that she was "hoping to leave to travel on Wednesday, July 13, 2011." The Department approved her request. On July 14, officers observed Merritt's city-issued car being driven around town. The Department dispatched two officers to Merritt's house to investigate. Merritt's mother answered the door. She told the officers that Merritt's daughter had taken Merritt to the airport earlier in the day, and that Merritt "was in Philadelphia for [the] funeral." The officers asked Merritt's mother for the keys to the city-issued car so they could return it to the Department. The officers were waiting at the door while Merritt's mother purported to search for the keys when Merritt herself appeared. The officers questioned Merritt about her mother's false statements. Merritt responded that "there [were] a lot of kids in the house and she must have got[ten] confused." The next day, July 15, Fitzgerald e-mailed the city manager, informing him that "there [was] some question whether [Merritt] misled us regarding a request for time off." Fitzgerald promised that the issue would be "thoroughly investigated."

The "thorough investigation" promised by Fitzgerald turned out to be nothing more than a generous interpretation of the Department's funeral leave policy. At the time, the policy stated that City officials could "grant a regular, full-time employee paid emergency leave in the event of a death within the

2

employee's immediate family or household," and that "[n]ormally, a one to three day absence should be sufficient depending upon individual circumstances, such as location of the funeral and closeness of the relationship." Fitzgerald testified that, because "it wasn't specified" in the policy "that [Merritt] had to leave town," he determined that she had not violated the policy. Assistant Chief Keith Jemison ("Jemison") admitted that "[t]here was no formal investigation," while Fitzgerald confessed he never investigated whether Merritt had meant to mislead him. It appears from the record that Merritt never traveled to Philadelphia.

Within a few days of the "investigation" into her request for funeral leave, Merritt e-mailed Fitzgerald saying that she wanted to be demoted to lieutenant. Merritt did not mention the funeral leave issue as a reason for her request. Fitzgerald met with Merritt to discuss her request. He testified that neither of them mentioned the funeral leave issue because "[t]hat didn't factor in." At around the same time, rumors began circulating that Merritt had lied to obtain funeral leave, and that Fitzgerald was allowing her to take a voluntary demotion in lieu of formal discipline.

On July 20, the Department held a COMPSTAT Meeting[1] with all officers, followed by a Supervisor Meeting with only higher ranking officers. At the time, Fitzgerald was considering a proposal to require all officers with the rank of lieutenant or higher to wear white shirts. Paske asked Fitzgerald whether he had reached a decision and quipped that only "firemen, milk[men,]

---

[1] COMPSTAT meetings are modeled after a program pioneered by Police Commissioner William Bratton during his first term with the New York City Police Department. In the New York model, precinct commanders are expected to "appear before the department's top echelon to report on crime in their districts and what they are doing about it." James J. Willis, Stephen D. Mastrofski & David Weisburd, *Making Sense of COMPSTAT: A Theory-Based Analysis of Organizational Change in Three Police Departments*, 41 LAW & SOC'Y REV. 147, 147-48 (2007).

No. 14-20292

and Klansmen wear white in Texas." Paske averred that Fitzgerald "only smil[ed]" and said he would be make a decision soon. Fitzgerald then opened the floor for questions. It was typical for supervisory officers to "air their complaints or their concerns" during this time, usually about "reports not being checked" or "operational issues." Paske asked whether "she was getting demoted and was he getting promoted," gesturing to Merritt and the officer rumored to be her replacement as captain.[2] At that point, "Fitzgerald's face turned red[,] and he hesitated for a second," but he confirmed that Merritt was taking a voluntary demotion. A few moments later, Fitzgerald asked Paske "why [he had] not been the proctor for the [COMPSTAT Meeting]" and accused Paske of failing to obey an order issued several months before to lead the COMPSTAT Meetings.[3]

After the Supervisor Meeting, Paske sent Fitzgerald an e-mail apologizing for his "lack of respect at the [COMPSTAT] meeting." A few hours later, Fitzgerald sent an e-mail to the Department's supervisory officers with the suggestive subject line "COMPSTAT meeting outburst." Fitzgerald announced Paske's suspension pending an investigation and commanded those present at the Supervisor Meeting to "ensure you each provide . . . Jemison individual memos specifically regarding . . . Paske's questions, demeanor, and

---

[2] The Department later determined that Paske's reference to his superior officers as "she" and "he" was disrespectful and violated the Department's policies.

[3] In May 2011, Paske volunteered to lead upcoming COMPSTAT Meetings. Paske believed his agreement to lead COMPSTAT Meetings was contingent on his agreement to fill a special operations role, which he later chose not to take on. Captain John Bailey ("Bailey") was the officer generally responsible for leading COMPSTAT Meetings during the relevant time period. He averred that there was some discussion in May 2011 about Paske co-leading the June 2011 COMPSTAT meeting, but that he later heard Paske was going to be out-of-town on the date of the June meeting. Bailey stated that before the July meeting, no one suggested that Paske was supposed to lead the meeting, even when he sent e-mails to Fitzgerald and others making clear that he would lead the meeting as usual. Bailey further averred that the July 2011 meeting "went forward as usual," and that "[n]obody, not Chief Fitzgerald and not anyone else, ever once asked why Sgt. Paske was not at the front of the room running the meeting. Nothing unusual happened in the meeting."

statements, made to me and/or anyone during the COMPSTAT meeting today." He urged the officers to "be as specific as possible."

On July 21, the Department officially charged Paske with disobeying orders and using inappropriate language and suspended him during the investigation. A week later, Fitzgerald called Paske to a meeting (the "Punishment Meeting"). Fitzgerald informed him that he was adopting the investigator's recommendation and imposing an 80-hour suspension without pay. Fitzgerald also went above the investigator's recommendation and demoted Paske to "patrol" with a commensurate decrease in salary. Due to his relocation in the Department's command structure, when Paske returned to work after his suspension, he reported to Merritt.

Almost immediately after Paske's return, Merritt imposed a "Performance Improvement Plan" ("PIP") on him, this time for his allegedly "unacceptable behavior" during the Punishment Meeting. The official notice stated that, during the Punishment Meeting, Paske "became visibly tense, [his] face became red, [he] tightened [his] body and fists, and began shaking [his] legs." It further charged that he "began to stare off to the left while shaking [his] head."[4] As part of the PIP, the Department ordered Paske to undergo a vocational evaluation, which the parties refer to as an employee assistance program ("EAP").

The EAP sessions were coordinated by a team of vocational experts. Those experts referred their cases to third-party counselors who actually conducted the sessions. A high-ranking officer in the Department called the EAP coordinator and characterized Paske's alleged behavior during the Punishment Meeting as threatening. After Paske told the third-party

---

[4] Officer Paske provided testimony contradicting these allegations. We mention these charges to explain the rationale the Department adopted for imposing the PIP, not because we accept their veracity.

counselor during his first EAP session that he had lost weight and struggled with his blood pressure, the EAP coordinator reviewing Paske's file recommended to the counselor that Paske be tested for drug use. The counselor resisted ordering a drug test. A short time later, a high-ranking officer in the Department called the EAP coordinator, this time alleging that Paske had lied to the third-party counselor when he said he was taking a week's vacation.[5] After receiving this additional information, the third-party counselor relented and agreed to order Paske to undergo drug testing after the second EAP counseling session. The Department arranged for the counselor to give Paske a letter at the end of the session ordering him to report to the Department immediately for testing.

On the morning of the second EAP session, Paske had arranged for his mother-in-law to care for his children. Before Paske left for the session, his mother-in-law was hit by a car and seriously injured. Paske knew he was already in trouble with Fitzgerald, so he decided to leave his infant with a neighborhood acquaintance and his older children unattended at home while he went to the second EAP session. He informed his direct supervisor of his mother-in-law's injury and asked him to inform higher-ups of the family emergency. When the counselor informed Paske about the drug testing requirement, he thought she would conduct the testing. The counselor testified that Paske was willing to undergo testing. When he learned that the Department would coordinate the testing, however, he told the counselor that he feared they would falsify the results to justify his dismissal. After leaving the EAP session, Paske called a high-ranking supervisor and told him about his family emergency. Within a few minutes, Fitzgerald called Paske directly

---

[5] It appears that Paske did not lie about vacation. The vacation time was pre-approved by Paske's immediate supervisors.

and ordered him to report to the Department within an hour. Paske told Fitzgerald that he "could not" obey the order. Fitzgerald later testified that he "knew when [he] decided not to go to the police department it was the wrong decision." Fitzgerald terminated Paske later that day.

Paske sued the Government, asserting claims for: First Amendment retaliation[6]; Title VII race discrimination; Title VII race retaliation; and related state law claims. The district court granted the Government's motion for summary judgment in part, dismissing all of Paske's federal claims. The district court severed Paske's state law claims and, choosing not to exercise supplemental jurisdiction, remanded them to state court. The district court also granted the Government's motion to exclude certain testimony offered by Paske and Bailey. Paske appeals the district court's evidentiary determination and its dismissal of his federal claims.

## STANDARD OF REVIEW

This court reviews a district court's grant of summary judgment de novo. *Avakian v. Citibank, N.A.*, 773 F.3d 647, 650 (5th Cir. 2014). "In reviewing the district court's grant of summary judgment, we must view all the disputed facts and reasonable inferences in a light most favorable to the non-movant. . . ." *Branton v. City of Dallas*, 272 F.3d 730, 738-39 (5th Cir. 2001). We review a district court's decision to strike summary judgment evidence for an abuse of discretion. *See, e.g.*, *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999). "An abuse of discretion occurs only when all reasonable persons would reject the view of the district court." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 638 (5th Cir. 2012).

---

[6] The district court assumed that Paske brought this claim under 42 U.S.C. § 1983.

No. 14-20292

## DISCUSSION

### I.

The district court granted the Government's motion to strike evidence in part, excluding portions of Paske and Bailey's testimony. Paske generally contends that his and Bailey's statements are admissible under various rules of evidence. Having considered the various statements and the relevant rules of evidence, we agree with the district court that the statements lacked foundation. *See Paske*, 2014 WL 1366552, at *5-6. It follows that Paske cannot show that all reasonable persons would reject the district court's decision to strike the testimony.

Accordingly, we affirm the district court's decision to strike portions of Paske and Bailey's testimony.

### II.

The district court dismissed Paske's First Amendment retaliation claim. It explained that Paske's speech was "confined to his on-duty statements made to superior officers within the department itself regarding the department's inner workings and urging [his] direct and implied complaints and criticisms about Merritt and Chief Fitzgerald." *Id.* at *8. Based on this view of the uncontested evidence, the district court held that Paske spoke as an employee, not as a citizen. *Id.* We affirm for the same reason.

### A.

To establish a prima facie First Amendment retaliation claim, a public employee must show, *inter alia*, that he spoke as a citizen, and not as a public employee. *See Lane v. Franks*, 134 S. Ct. 2369, 2378-80 (2014).[7] In deciding

---

[7] *Lane* did not alter the test established in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *See Graziosi v. City of Greenville, Miss.*, 775 F.3d 731, 737 n.7 (5th Cir. 2015). The Government submitted a letter brief pursuant to Federal Rule of Appellate Procedure 28(j). It cited *Graziosi* and *Gibson v. Kilpatrick*, 773 F.3d 661 (5th Cir. 2014), and stated that these cases "provide additional authority in support of Appellees' position." We remind counsel that

No. 14-20292

whether a public employee speaks as a citizen or as a public employee, "[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379. When speech-related "[a]ctivities [are] required by one's position or undertaken in the course of performing one's job[ ]," they are within the scope of the employee's duties. *Haverda v. Hays County*, 723 F.3d 586, 598 (5th Cir. 2013). In contrast, if the speech-related activities are "the kind . . . engaged in by citizens who do not work for the government," they are protected. *Garcetti*, 547 U.S. at 423.

B.

Paske was invited to the Supervisor Meeting in his role as a police officer, his attendance was part of his job, and he spoke in response to an invitation from Fitzgerald for job-related questions. Moreover, by participating in internal discussions about the Department's operations, Paske "contribut[ed] to the formation and execution of official policy." *Mills v. City of Evansville, Ind.*, 452 F.3d 646, 647-48 (7th Cir. 2006) (holding that on-duty, in-uniform police officer who spoke to senior managers as they emerged from meeting spoke in her capacity as a public employee), *cited with approval in Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007). We also note that private citizens do not generally have the right to participate in closed-door meetings of ranking police officers. Considering the facts as demonstrated by the record as a whole, the district court did not err when it held that Paske spoke at the Supervisor Meeting as an employee, not a citizen, and that his speech was thus not protected by the First Amendment.

---

Rule 28(j) briefs "must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally." Fed. R. App. P. 28(j).

No. 14-20292

Accordingly, we affirm the judgment of the district court regarding Paske's First Amendment retaliation claim.

III.

The district court dismissed Paske's Title VII race discrimination claim. *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting race discrimination in employment). The district court held that Paske failed to "present[ ] evidence sufficient to raise a genuine issue of material fact that 'he was treated less favorably because of his [race] than were other similarly situated employees who were not [white], under nearly identical circumstances.'" *Paske*, 2014 WL 1366552, at *11 (second and third alterations in original) (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). We affirm for the same reason.

Because Paske attempted to prove race discrimination through circumstantial evidence, the *McDonnell Douglas* burden-shifting framework governs his claim. *See Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411-12 (5th Cir. 2007) (discussing modified *McDonnell Douglas* framework used in this circuit). To establish his prima facie case, Paske must show that

> (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

*Lee*, 574 F.3d at 259. Paske established the first three elements of his prima facie race discrimination claim. To establish the fourth element, Paske was required to show, *inter alia*, that his "conduct that drew the adverse employment decision [was] 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee*, 574

F.3d at 260 (quoting *Perez v. Tex. Dep't of Criminal Justice, Inst. Div.*, 395 F.3d 206, 213 (5th Cir. 2004)).[8]

Paske offers Merritt and another officer as comparators. Paske makes various allegations concerning Merritt, including: that she lied about the hours she worked for the City in early 2010; that she allowed her daughter's friends, who were known gang members, to stay at her house; that she was bad at her job; and that she lied when she requested funeral leave. Paske contends that the other officer: left his service revolver unsecured in his car, from which it was stolen; failed to report the theft; and then carried an unapproved, personal firearm while on duty. Paske was fired for failing to obey a lawful order, for refusing the drug test, for dereliction of duty, and for conduct unbecoming an officer. Even assuming Paske's allegations about Merritt and the other officer are true,[9] their behavior is not even close to being "nearly identical" to Paske's.

Because Paske failed to adduce evidence that a comparator was treated more favorably under nearly identical circumstances, he failed to establish a prima facie case of race discrimination. Accordingly, we affirm the judgment of the district court regarding Paske's race discrimination claim.

---

[8] Paske argues that he can establish the fourth element of his prima facie claim by showing that Fitzgerald's stated reasons for firing him were pretextual. That is not the law. First, Paske must establish a prima facie case by pointing to an appropriate comparator. Only then would Fitzgerald and the City have a duty to "offer an alternative non-discriminatory explanation for the adverse employment action." *Id*. at 259. And only after they provided that explanation would the pretext issue become relevant. *Id.* The cases Paske cites to support his misplaced pretext argument make abundantly clear that Paske must prove a prima facie case *as well as* pretext to succeed. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (explaining that "a plaintiff's prima facie case, *combined with* sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated") (emphasis added).

[9] Some of Paske's allegations regarding Merritt have never been addressed by a factfinder and are not well-supported by the record.

No. 14-20292

IV.

The district court dismissed Paske's Title VII race retaliation claim. *See* 42 U.S.C. § 2000e-3(a) (prohibiting retaliation against those opposing unlawful race discrimination). Paske argues that the Government never moved for summary judgment on his Title VII race retaliation claim, and that the district court granted the motion without giving him a chance to respond. The Government contends that any error was harmless.

"We review for harmless error a district court's improper entry of summary judgment *sua sponte* without notice." *Atkins v. Salazar*, 677 F.3d 667, 678 (5th Cir. 2011). "A district court's grant of summary judgment *sua sponte* is 'considered harmless if the nonmovant has no additional evidence or if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact.'" *Id.* (quoting *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coord. Unit*, 28 F.3d 1388, 1398 (5th Cir. 1994)).

According to Paske's own recollection of the Supervisor Meeting, he asked Fitzgerald simply whether "she was getting demoted and was he getting promoted." Besides Paske's own racially charged reference to "Klansmen" during the Supervisor Meeting, there is no evidence in the record that Paske spoke out about race discrimination. This court "ha[s] consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." *Davis v. Dall. Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (per curiam) (collecting cases). Just as in *Davis*, "[t]he only racial component of the entire . . . interaction was interjected by [Paske] [him]self," *id.*, when he referred to "Klansmen." Paske

No. 14-20292

"cannot rely upon [his] own use of a racially sensitive word to demonstrate that [his] accusation had racial overtones." *Id.*[10]

We assume that the district court dismissed Paske's race retaliation claim sua sponte and without notice. Even so, we hold that the district court's dismissal was harmless and affirm the district court's judgment.

## CONCLUSION

For the reasons explained, we AFFIRM the judgment of the district court.

---

[10] Paske argues that Fitzgerald and the City waived their arguments, citing *Martco Ltd. Partnership v. Wellons, Inc.*, 588 F.3d 864 (5th Cir. 2009). *Martco* applies when a summary judgment movant urges the court of appeals to affirm a district court's order for a reason not urged below. *Id.* at 877. *Martco* does not apply when we evaluate whether a district court's sua sponte summary judgment order was harmless. *See Atkins*, 677 F.3d at 678.