# United States Court of Appeals for the Fifth Circuit

_____

No. 23-10724

_____

United States Court of Appeals
Fifth Circuit

**FILED**

April 30, 2024

Lyle W. Cayce
Clerk

Raymond Donnelly; O'Tara Johnson,

*Plaintiffs—Appellants*,

*versus*

Academic Partnerships L.L.C.,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:20-CV-1106

_____

Before Jones, Clement, and Wilson, *Circuit Judges*.

Per Curiam:[*]

O'Tara Johnson and Raymond Donnelly sued their employer Academic Partnerships L.L.C. (AP) for, among other things, retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e17; 42 U.S.C. § 1981; and the Texas Commission on Human Rights Act (TCHRA), Tex. Lab. Code Ann. §§ 21.001–21.556. The district court granted summary judgment for AP on all claims. We affirm.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-10724

## I.

Johnson's and Donnelly's claims arise from two discrete sets of facts. We first outline the facts underlying Johnson's retaliation claim and then those underlying Donnelly's. Because the district court granted summary judgment in AP's favor, we construe all facts and inferences in the light most favorable to Johnson and Donnelly. *See Naquin v. Elevating Boats, L.L.C.*, 817 F.3d 235, 238 (5th Cir. 2016).

### A.

AP is a higher education service provider offering integrated university, marketing, and student services. AP hired Johnson, a black woman, as an Enrollment Specialist in November 2015. In February 2017, AP promoted Johnson to Enrollment Manager. Johnson alleges that upon promotion, AP only gave her a $6,000 raise, when male employees promoted to similar positions were given $10,000 raises. She complained about this discrepancy to a supervisor and Human Resources (HR) and tried to negotiate a higher salary, but she was told the salary offer would not be increased.

In January 2018, Robert Wagner, a black man, and Mark McCreight, a white man, were also promoted to Enrollment Manager. Wagner and McCreight told Johnson that they were allowed to negotiate their salaries. So Johnson again complained, to her manager, James Twedt, and the Senior Vice President of HR, Mary Ann Doran. After Twedt and Doran "refused to fix the issue," Johnson escalated her complaint to Earl Frischkorn, Senior Vice President of Enrollment Services. Frischkorn gave Johnson a 4.5% increase in pay to rectify her concerns.

Johnson alleges that after her complaint regarding the pay discrepancy, AP began retaliating against her. For example, she asserts that Salah Eid and Mark Mendoza, two of her supervisors, told Johnson that her

salary was lower because of her "effort and attitude," and that Eid told Twedt that he had been "trying to work on some form of progressive discipline [for Johnson] for five to eight months." Further, in November 2018, Johnson applied for a promotion to a Partner Support position. After she applied, she avers that Eid asked her "what a black girl going to do with all that money when you get that job?"

In December 2018, AP promoted GiGi Tippens, a white woman, to Senior Manager. Johnson alleges that AP "cherry-picked" Tippens and did not allow other qualified candidates, who were all black, to interview for the position. Johnson lodged another complaint on December 17 with HR's Doran that AP was engaging in a "pattern of discriminatory treatment and hiring practices." She explained to Doran that she was nervous about coming forward with her complaint because AP might retaliate by denying her application for the Partner Support position.

On January 7, 2019, Ashley Harris, another Enrollment Manager, complained to Eid that Johnson had revealed confidential information about the impending termination of an Enrollment Specialist on Harris's team to Ijeoma Nkele. Eid and HR representative Tena Bracy investigated. Afterwards, Bracy informed Frischkorn that Nkele confirmed that Johnson told her about the termination. But when Eid and Bracy asked Johnson about the incident, she denied that it happened. Eid and Bracy then consulted with Frischkorn, who decided to issue Johnson a Final Written Warning. That action made Johnson ineligible for the Partner Support promotion.

Eid and Bracy met with Johnson to convey the Final Written Warning. After the meeting, Bracy reported to Frischkorn that Johnson was "extremely aggressive and combative during the meeting," so much that Bracy "felt threatened by Johnson's unprofessional behavior, and thought Johnson was going to hit her." Bracy told Frischkorn that Johnson "yell[ed]

at [her] in an aggressive tone," "bang[ed] her hand on the table," and "walk[ed] out of the meeting[,] . . . slamming the door so hard that it shook the room causing other employees to inquire about Bracy and Eid's well-being." Frischkorn confirmed Bracy's allegations with Eid and then talked to Mendoza and Doran, who told him that Johnson also confronted them in an "unprofessional manner" after the meeting. In her telling, Johnson admits that she was "upset" and "emotional" during the meeting, but she maintains she was seated the entire meeting and denies that she was "yelling" or "combative."

Doran met with Johnson on January 11. Afterwards, Doran advised Frischkorn that Johnson admitted to acting unprofessionally when she received the Final Written Warning. Johnson asserts that she also raised a complaint during this meeting with Doran, that the Final Written Warning was in retaliation for her December 17 discrimination complaint.[1] Doran did not advise Frischkorn that Johnson made any complaint about discrimination or retaliation during the meeting.[2]

After considering Johnson's behavior over the weekend, Frischkorn decided to fire her. A "decisive factor" was that "[he] could not support a member of leadership engaging in such unprofessional conduct, especially given that [he] had recently held a leadership meeting . . . wherein [he] emphasized leadership style and the importance of setting a good example for [AP's] teams." Frischkorn was not aware of Johnson's making any

---

[1] AP argues we should not consider Johnson's statement that she complained about discrimination in the January 11 meeting because the district court struck that statement when ruling on the motion for summary judgment. But this court already denied AP's motion to strike that part of Johnson and Donnelly's brief.

[2] In fact, Doran asserts that Johnson did not broach the topic of discrimination or retaliation at all in their January 11 meeting.

allegations of discrimination or unfair treatment when he decided to fire her. Johnson's termination was effective January 14, 2019.

**B.**

AP hired Donnelly, a 54-year-old black man, as an Enrollment Specialist in September 2014. Donnelly was responsible for facilitating the enrollment of students with AP's partners over the phone. Between July 2015 and June 2016, AP issued Donnelly multiple warnings for missing performance goals and repeated tardiness. On June 21, 2016, Donnelly sent an e-mail to HR Manager Jennifer Shelton about his Industry Coach, Cortney West, a black man. Donnelly criticized West's "training style" and complained about receiving low scores for his call reviews, but he never alleged that West, or anyone else, discriminated against him based on a protected class.

In August 2016, Donnelly sent another e-mail to Shelton and his supervisor, Miranda Behn, complaining about West's behavior. Among other things, Donnelly asserted that West targeted him with "malicious and inflammatory comments" and stated that he had "lost all respect for and trust in . . . West as a member of [AP] leadership." But again, Donnelly did not state that he was discriminated against based on any protected class.

After his second e-mail, Donnelly contends that Behn and another supervisor, Sal Meherali, unfairly targeted him "by repeatedly interfering with [his] chances of promotion." He alleges that he received an increased number of verbal warnings that prevented him from being eligible for promotions; Behn told her team that Donnelly "should not be eligible for anything"; and he overheard a phone call in which Behn asked Johnson to "manufacture a reason to write up Donnelly."

In December 2017, Donnelly sent an e-mail to Shelton asserting that several team members were "out to get" him, he was being targeted, and it

seemed like there was a "witch hunt" against him. Donnelly also complained to Doran in January 2018 about "all [the] incidents . . . from [the] beginning of [his] tenure." But Donnelly never asserted that he was discriminated against based on a protected class.[3]

In August 2018, Meherali confronted Donnelly about accessing AP's database before his shift to search for call leads. Meherali later sent an e-mail to his entire team stating that this type of data manipulation was against AP's policy and "could result in further disciplinary action." In September, Meherali issued Donnelly a written warning with a performance improvement plan (PIP) after one of his calls failed a quality assurance screening. Later that month, Donnelly failed another quality assurance screening. Meherali issued Donnelly a Final Written Warning with another PIP.

In October, Donnelly asked Meherali to transfer him a call lead that belonged to another Enrollment Specialist. In response, Meherali asked Donnelly why he would be calling students who did not belong to him. Donnelly admitted that he had been contacting students who did not originate with him, in violation of AP's policy outlined in Meherali's earlier teamwide e-mail. As a result, Meherali consulted with HR's Bracy about Donnelly's data manipulation. Then, at the end of October, Donnelly failed yet another quality assurance screening.

On October 29, Bracy consulted with Frischkorn about Donnelly's ongoing performance issues. On October 31, Donnelly requested a meeting with HR, and a meeting was scheduled with Bracy for November 1. Prior to

---

[3] Donnelly contends in his brief that in December 2017 he "submitted a complaint to Shelton explaining that he was being discriminatorily targeted," and in January 2018 he "met with Doran and complained of AP's discriminatory hiring and promotion practices." Those statements are not supported by the record.

Bracy's meeting with Donnelly, Shelton met with Frischkorn, Bracy, and Meherali to discuss Donnelly's performance and behavioral issues. During that meeting, Frischkorn decided to terminate Donnelly due to his ongoing data manipulation and other performance issues. But Shelton decided to wait until after Donnelly's meeting with Bracy before signing off on Donnelly's termination "from an HR perspective."

Donnelly met with Bracy. Donnelly asserted in his deposition that he told Bracy he "felt like [he] was being targeted . . . discriminated against . . . [and that] there was a disparity with the difference between the way—as far as promotions, the way blacks and whites were treated at the job." However, upon further questioning, Donnelly conceded that he did not "recall the specifics of the dialogue between [him and Bracy]." Bracy's notes from the meeting do not disclose that Donnelly made any allegation that he was discriminated against based on a protected class. Moreover, on November 8, Donnelly sent Bracy a follow up e-mail detailing his grievances, none of which alleged discrimination based on a protected class.

On November 14, 2018, AP fired Donnelly for data manipulation and performance issues.

## C.

Johnson and Donnelly sued AP on May 1, 2020, alleging discrimination, a hostile work environment, and retaliation claims under Title VII, § 1981, and TCHRA.[4] In December 2022, AP moved for summary judgment on Johnson's and Donnelly's claims, and, in June 2023, the district

---

[4] Another plaintiff, Dante Williams, sued AP as well. But the district court dismissed his claims with prejudice, and that order is not at issue.

court granted AP's motion.  On appeal, Johnson and Donnelly challenge only the district court's dismissal of their retaliation claims.

## II.

"We review grants of summary judgment *de novo*, applying the same standard as the district court."  *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017) (citing *Templet v. Hydrochem Inc.*, 367 F.3d 473, 477 (5th Cir. 2004)).  "[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "We may affirm a grant of summary judgment 'based on any rationale presented to the district court for consideration and supported by facts uncontroverted in the summary judgment record.'"  *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 887 (5th Cir. 2002)).

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims under Title VII.  *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 219 (5th Cir. 2016); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973).[5]  Under that framework, the plaintiff must first establish a prima facie case of retaliation.  *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 171 (5th Cir. 2014).  If the plaintiff succeeds, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the underlying employment action.  *Id.*  Finally, if the defendant has satisfied its

---

[5] We use the same "rubric of analysis" for retaliation claims under § 1981 and TCHRA as we do for Title VII claims.  *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021) (Section 1981); *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170–71 (5th Cir. 2014) (TCHRA).  Accordingly, we do not distinguish between Johnson's and Donnelly's Title VII, § 1981, and TCHRA claims for the purposes of our analysis.

No. 23-10724

burden of production, the plaintiff must then show that the proffered reason is mere pretext for retaliation. *Id.*

## III.

The district court concluded that Johnson could not establish a prima facie case of retaliation because she failed to show a causal link between her protected activity (the December 17 complaint)[6] and AP's adverse employment actions (the Final Written Warning and her termination). Specifically, the court held that "[t]he causal link [did] not exist because Frischkorn . . . testified that no one at AP ever told him that Johnson raised any race-based discrimination or unfair treatment allegations." AP also argued that Johnson failed to show that its legitimate, non-retaliatory reasons for firing her—the sharing of confidential information and her unprofessional conduct—were pretextual. But the district court did not address that argument.

As to Donnelly's retaliation claim, AP first argued that Donnelly failed to establish that he engaged in a statutorily protected activity, as required for his prima facie case. The district court assumed without deciding that Donnelly engaged in protected activity when he complained to Bracy on November 1, and instead found no causal link between that complaint and his termination because Frischkorn decided to terminate Donnelly before Donnelly's meeting with Bracy. Alternatively, it found that Donnelly presented no evidence of pretext to rebut AP's legitimate, non-retaliatory reason for firing Donnelly.

---

[6] As explained *supra* note 1, the district court did not consider Johnson's January 11 complaint.

No. 23-10724

We first discuss Johnson's retaliation claim and then Donnelly's.

## A.

Johnson contends the district court erred in holding that she did not establish a prima facie case for her retaliation claim because the temporal proximity between her December 17 (and January 11) complaints and her January 14 termination was sufficient to establish a causal link, notwithstanding Frischkorn's lack of knowledge of her complaints. She is likely correct.

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in [a] protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action." *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007)). "While generally, a causal link is established when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity, it can also be established simply by showing close enough timing between the two events." *January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023) (internal quotation marks and citations omitted). This court has previously held that a six-week span "does the trick." *Id.*

The timing between Johnson's December 17 and January 11 complaints and her January 14 termination easily satisfies a causal link for her prima facie case. *See id.* AP counters that "while a close temporal proximity . . . can be enough to establish a causal link, the causal link is shattered if uncontroverted evidence is presented that the decision-maker is unaware of the alleged protected activity." However, that argument is foreclosed by *January*. There, the district court "concluded that [the plaintiff] did not establish a causal connection because he failed to show that

[the ultimate decisionmaker] knew that [the plaintiff] intended to file charges with the employment commissions when he was fired." *Id.* (internal quotation marks omitted). This court unequivocally held that the district court erred because "the short time between [the plaintiff's] protected acts and his firing [was] *itself* enough to show causation." *Id.* Accordingly, Johnson established her prima facie case.

However, Johnson's claim nonetheless falters because she fails to show that AP's legitimate, non-retaliatory reasons for firing her—the sharing of confidential information and her unprofessional conduct—were pretextual.[7] The standard for proving causation at the pretext stage is more stringent than at the prima facie stage. *See Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1001 (5th Cir. 2022). Consequently, though temporal proximity between a plaintiff's protected activity and the employer's adverse employment action is relevant, it is not alone sufficient to demonstrate pretext. *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 579 (5th Cir. 2020). Rather, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). Normally, this is done by providing significant evidence that the ultimate decisionmaker harbored retaliatory animus towards the plaintiff. *See id.* Alternatively, a plaintiff may "use a cat's paw theory of liability when [she] cannot show that the decisionmaker . . . harbored any retaliatory animus." *Id.* But to invoke the

_____

[7] As noted above, AP argued in its motion for summary judgment that Johnson failed to show pretext. Though the district court did not address pretext in its order, we "may affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (internal quotation marks and citation omitted).

"cat's paw" analysis, a plaintiff "must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited [retaliatory] animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'" *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)).

Because Johnson does not dispute that Frischkorn lacked knowledge of her complaints, she necessarily relies on a cat's paw theory of liability.[8] She argues that "the Final Written Warning and termination decisions were based almost solely on the recommendations of Eid, Bracy, Doran, and Mendoza—not Frischkorn's investigation." But that is not enough to show pretext; Johnson must also show that Eid, Bracy, Doran, or Mendoza exhibited retaliatory animus. *See Roberson*, 373 F.3d at 653. "While we have not precisely defined [animus]," it suggests at least some form of "ill will, antagonism, or hostility." *See Roque v. Natchitoches Par. Sch. Bd.*, 583 F. App'x 466, 467 (5th Cir. 2014) (Jolly, J., concurring). Johnson provides no evidence that Bracy, Doran, or Mendoza exhibited any such behavior. Accordingly, she cannot rely on their actions to establish pretext.

Johnson points to Eid's statement that he was "trying to work on some form of progressive discipline [for Johnson]" and his question about "what a black girl going to do with all that money when you get that job?" as "strong indicators of retaliatory animus." But even assuming those statements rise to the level of "animus," Frischkorn's uncontroverted

---

[8] AP asserts that Johnson forfeited this argument by failing to raise it in the district court. True enough, the only contention Johnson raised in the district court that could be construed as a "cat's paw" argument was related to her discrimination claim. Regardless of whether she forfeited her argument, her claim fails for the reasons discussed above the line.

testimony shows that Eid did not possess leverage or exert influence over Frischkorn. As to the Final Written Warning, Frischkorn testified that Bracy—not Eid—advised him that Nkele confirmed that Johnson had told Nkele about the impending termination. And as for Johnson's termination, Frischkorn's testimony clearly shows that he primarily relied on information from Bracy and Doran when making his decision. Although Frischkorn "spoke with Eid" before terminating Johnson, it was only to corroborate Bracy's statements. Consequently, Johnson's cat's paw theory of retaliation as to Eid fails on the second prong. *See Roberson*, 373 F.3d at 653.

Though the district court likely erred by concluding that Johnson failed to establish a causal link for her prima facie case, her retaliation claim still fails because she has not shown that AP's legitimate, non-retaliatory reasons for its adverse employment actions were pretext for retaliation. We therefore affirm summary judgment for AP as to Johnson's claim. *See Nola Spice Designs*, 783 F.3d at 536.

## B.

Donnelly contends the district court erred because he "satisfied both the causal connection [of his prima facie case] and pretext" for his retaliation claim. We need not reach Donnelly's pretext argument because we agree with AP that Donnelly fails to establish that he engaged in a statutorily protected activity. Moreover, we agree with the district court that he fails to establish the causal link required to sustain his prima facie case.

Again, to establish a prima facie case of retaliation, a plaintiff must show that: "(1) [he] engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action." *Royal*, 736 F.3d at 400. "Protected activity is defined as opposition to any practice rendered unlawful by Title VII . . . ." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385

(5th Cir. 2003) (citation omitted). "This court 'has consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." *Paske v. Fitzgerald*, 785 F.3d 977, 986 (5th Cir. 2015) (quoting *Davis v. Dall. Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (collecting cases)).

As explained above, none of the complaints lodged by Donnelly prior to his November 1, 2018, meeting with Bracy alleged that anyone discriminated against him based on a protected ground. *See supra* Part I.B. Accordingly, those complaints cannot satisfy the first element of Donnelly's prima facie case. *See Paske*, 785 F.3d at 986.

As to the purported November 1 complaint, Bracy's meeting notes do not substantiate any assertion by Donnelly that he was discriminated against based on a protected class. Likewise, Donnelly's November 8 follow-up e-mail does not disclose any grievance of discrimination based on a protected class. Though Donnelly alleges that he told Bracy that he "felt like [he] was being targeted . . . discriminated against . . . [and that] there was a disparity with the difference between the way . . . blacks and whites were treated at the job," he later admitted—via sworn testimony—that he did not "recall the specifics of the dialogue between [him and Bracy]." Donnelly's other deposition statements that he "felt like [he] was being . . . discriminated against" are not sufficient evidence to show that he engaged in a statutorily protected activity. *See Turner*, 476 F.3d at 343 ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."). Accordingly, Donnelly's retaliation claim fails on the first element of his prima facie case.

Even if we assumed otherwise, Donnelly's claim still fails on the causal element because Frischkorn decided to terminate him before Donnelly's meeting with Bracy. *See Davis*, 448 F. App'x at 493–94. In

evaluating temporal proximity, Donnelly asserts that we should consider the day his termination was effective, rather than the day Frischkorn decided to terminate him. But "[t]he mere fact that [Frischkorn's] decision was made prior to the conclusion of any formal investigation, or that it was finalized in the period after [Donnelly] filed [his] grievance . . . does not change the outcome." *Id.* "Because [Donnelly's alleged] protected activity occurred after [Frischkorn settled on his termination], [Donnelly] cannot demonstrate causation." *Id.*[9]

Accordingly, the district court properly entered summary judgment dismissing Donnelly's retaliation claim.

## IV.

For the foregoing reasons, the district court's summary judgment for AP is

AFFIRMED.

---

[9] Donnelly also contends that Frischkorn's statement that he decided to terminate Donnelly before his meeting with Bracy is "uncorroborated" and "disputed." However, Frischkorn's statement is corroborated by Shelton's testimony and Bracy's timeline of events that she sent to Shelton on November 6. Contrarily, Donnelly provides no evidence to dispute Frischkorn's statement.